**SEA–LAND SERVICE, INC.**, Petitioner,

v.

**FEDERAL MARITIME COMMISSION**
and United States of America,
Respondents,
TMT Trailer Ferry, Inc., Intervenor.

No. 21217.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 15, 1968.

Decided May 28, 1968.

Mr. Warren Price, Jr., Washington, D. C., for petitioner.

Mr. Joseph F. Kelly, Jr., Atty., Federal Maritime Commission, with whom Asst. Atty. Gen., Donald F. Turner, Messrs. James L. Pimper, General Counsel, Robert N. Katz, Solicitor, Federal Maritime Commission, and Irwin A. Seibel, Atty., Department of Justice, were on the brief, for respondents.

Mr. Homer S. Carpenter, Washington, D. C., with whom Mr. Richard R. Sigmon, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, Chief Judge, and BURGER and LEVENTHAL, Circuit Judges.

## LEVENTHAL, Circuit Judge:

Petitioner, Sea-Land Service, Inc. (Sea-Land), operates a fleet of modern, self-propelled cargo ships with routes between several Puerto Rican cities (including San Juan) and several Atlantic coast United States cities (including Jacksonville, Florida). Sea-Land has on file with the Federal Maritime Commission a schedule of tariffs covering the various commodities in the San Juan trade, and, in general, these tariffs are the same to and from all mainland ports. Intervenor, TMT Trailer Ferry, Inc. (TMT), is also a carrier by water servicing the San Juan-Jacksonville route. In contrast to Sea-Land, however, TMT is a small, less modern, tug and barge operation and its sole Puerto Rican-United States shipping is between Jacksonville and San Juan.[1] In general, TMT tariffs are lower on commodities which both carriers transport. This proceeding grows out of Sea-Land's efforts to establish the right to charge rates as low as TMT's from Jacksonville to San Juan.

In particular, in March 1964, Sea-Land filed an amendment to lower its tariff on stoves to a competitive level with TMT. On April 30, 1964, the Commission ordered a hearing to investigate the Sea-Land amendment. During the succeeding few months the scope of the investigation was expanded three times to include for consideration proposed lower rates by TMT for stoves shipped in less-than-trailerload quantities, proposed lower rates by Sea-Land for northbound scrap metal, and proposed tariff increases by Sea-Land for refrigerated items (a trade in which TMT did not compete). In addition, the Commission, on its own motion, expanded the inquiry to cover (1) "the issue of whether TMT is entitled to maintain a differential below the rate of Sea-Land" and (2) "the question of the lawfulness of the differences in rates [by Sea-Land] on the same commodities between Jacksonville, Florida, and Puerto Rico and other Atlantic ports and Puerto Rico."

In October 1964, the Commission dismissed the proceeding insofar as it related to the proposed tariffs on stoves and refrigerated items since the carriers had withdrawn their amendments. The hearing proceeded, however, to consider Sea-Land's scrap metal amendment and to investigate the general questions pertaining to TMT-Sea-Land rate differentials in light of the competitive situation in Jacksonville, and possible future Sea-Land rate differentials between mainland ports in terms of the Shipping Act.

---

1. One of TMT's voyages is broken by a stop at Miami.

In May 1967, the Commission issued a "report" in which it concluded after hearing oral argument that TMT's generally lower tariffs vis-a-vis Sea-Land were justified,[2] and that Sea-Land had no general right to maintain lower tariffs at Jacksonville than at other cities merely to meet price competition from TMT. But it held lawful Sea-Land's amendment reducing the rate on scrap metal northbound from San Juan to Jacksonville. Apparently TMT does not carry scrap metal in this trade.

Thereafter, Sea-Land petitioned the Commission to re-open the record and hold a further hearing to consider evidence which Sea-Land proffered as sustaining its general legal assertion that TMT was not entitled to a rate advantage. Its petition stated that since the earlier proceeding had terminated, a new carrier, South Atlantic & Carribbean Line, Inc. (SACAL), announced that it would enter the Jacksonville-Puerto Rican commerce providing services comparable to Sea-Land's at TMT's rates. The Commission, in July 1967, denied the petition to reopen the hearing or reconsider the "report," which it stated "is largely declaratory of the general considerations involved" and which was directed to the "question of differentials generally." The Commission also noted that "no order was issued against Sea-Land" and that "[i]t has not been required to modify its rate structure." The petitioner seeks review of both the "report" and the order denying his petition to reopen the hearing which culminated in the report.

■ The initial and decisive issue presented by this petition is whether under the statutes[3] and the applicable case law the agency action complained of is ripe for judicial review. The doctrine of ripeness to review the results of administrative proceedings is a doctrine rooted in practical considerations, and assessment of both judicial efficiency and fairness to the parties.[4]

■■ Its contours were recently outlined in broad strokes:

Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and [the] hardship to the parties of withholding court consideration.

Abbott Laboratories v. Gardner, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

■ The Commission has termed the decision contested by appellant a "report." But its label is not conclusive, and what is decisive is the substance of what it has done. Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

The proceeding which culminated in the report began as, and to a limited extent remained, a hearing to inquire into proposed specific tariff amendments in the Jacksonville-San Juan trade. How-

2. Without pursuing the details of the Commission's reasoning, it may be noted that the Commission found that shippers would generally prefer the more modern, faster and more dependable service of Sea-Land if rates were equal. The Commission noted that TMT's vessels have slower sea transit time (7 to 9 days, compared with 3 days for Sea-Land's self-propelled vessels). The Commission stated that hazard and probable condition of cargo on arrival is a shipper concern and that minor considerations assume a major role where ocean freight rates are equal.

3. 28 U.S.C. § 2342 (1964); 5 U.S.C. §§ 702, 704 (1964 Supp.II).

4. 3 DAVIS, ADMINISTRATIVE LAW TREATISE ch. 21 (1958); JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION ch. 10 (1965).

ever, before the proceeding concluded, three of the four specific rate proposals dropped out of the case and the inquiry was expanded by the Commission to encompass a general investigation of the Shipping Act's proscriptions to possible future action by Sea-Land. Nothing in the report either ordered Sea-Land to alter in any way existing rates or denied to Sea-Land the power to effectuate a concretely proposed tariff amendment. Thus, there was no direct or immediate injury accruing to petitioner as a result of the report.

Our analysis of injury does not stop with an examination of direct and immediate effects alone. The results of the general inquiry were the report's legal conclusions which sanctioned the status quo and set forth the view that any action by Sea-Land to lower its Jacksonville rates across-the-board, at least while leaving its other rates untouched, would be impermissible.

■ The report is ambivalent. On the one hand it contains elements of a declaration of rights of the parties such as might be contained in a declaratory judgment. On the other hand, when the Commission declined to reopen the record for updating in the light of new evidence it noted that its report was declaratory of general considerations and general policy but that no order had been issued against Sea-Land and it had not been required to modify its rate structure.

On balance we think two considerations combine to militate against ripeness for judicial review on this record.

The first consideration is that the Commission has not been confronted with a specific rate proposal that Sea-Land wants to put into effect. Consideration of a specific proposal may well lead the Commission, assuming it ad-

heres to the view that Sea-Land may not lower its rates to obtain full parity with TMT, to qualify or provide exceptions to the general principles.

The agency might well permit rate competition with TMT on some commodities (as it has apparently done on northbound rum, cocoanuts, and pineapples) or Sea-Land port discrimination on some commodities (as it has done with northbound scrap metal in this very proceeding) if those questions are considered in the light of specific rate filings.

There is yet another aspect to the issue of the ripeness of the general declaration in the absence of a specific rate filing. It would be unlikely that a court would undertake, on a record like this one,[5] to define the bounds of reasonableness in rate divergences. There is always a danger, as well as a philosophical problem, in permitting jurisdictional questions to turn on assumptions as to the merits that have, by hypothesis, not been considered. But we know enough about the kind of problem involved in rate regulation to register a concern about grappling with them in the absence of a specific rate focus. We do not say this would never be appropriate. It is enough to say the problems involved are not insubstantial.

This consideration is partly offset, perhaps, by petitioner's claim that it is confronted with a substantial disadvantage because of the legal pronouncements in the report. It is said that the Commission relies on the broad pronouncements in exercising its admitted discretion to suspend temporarily proposed tariff amendments. Petitioner points to the Commission's "automatic" suspension of Sea-Land's subsequently proposed rate reduction on the carriage of doors. Sea-Land says that in the absence of a protest by a party the Commission does not ordinarily suspend a

---

5. The Examiner's "discussion" concludes with the following observation:

TMT is entitled to a differential. The extent of the differential is not presented here. Had it been an issue, it could not have been determined on this record. The entire trade is involved with hundreds of commodities, many having different costs of handling, different service values, and transportation characteristics.

rate amendment, and asserts that the four-month suspension period that will accompany every reducing amendment results in sufficient adversity to warrant review of the general report.

█ In some situations the suspension of a privilege, even for a short time, may be so injurious that the agency's policy statement indicating the criteria for suspension will be ripe for review. Here, however, we do not think a four-month suspension, provided by Congress as a kind of stay *pendente lite*, to maintain the status quo while the agency takes a look at the specific problem submitted to it, presents in the circumstances of this controversy the kind of specific injury that overrides the more general considerations we have discussed.

The report is essentially a statement of legal opinion rooted in an appraisal of the competitive situation between two carriers taken at a point in time. Such a report may be reviewable when it signals action that is well nigh inevitable, or at least probable, in the near future. Our conclusion that this would not be a fair characterization of the situation before us is underscored by the second consideration militating against review at this time, that the situation has changed and the facts are no longer those which were before the agency even a year ago. A new competitor, SACAL, has entered the Jacksonville-San Juan trade. Petitioner itself stressed the significance of this development when it put that forward, unsuccessfully, as a reason why the agency should reopen the hearing and reconsider the report in the light of an up-dated record.

█ Another matter merits brief comment. On a somewhat confused procedural record Sea-Land makes the claim that TMT's rate structure is unlawful under 46 U.S.C. § 816, First (1964), since it diverts cargo to Jacksonville from inland origins rate-favorable to Elizabeth and Baltimore. As we have already observed, the order of investigation and the various supplemental orders affecting the scope of the Commission's inquiry led both the Examiner and the Commission to identify the general purpose of the proceeding as one to examine the competitive relationship between Sea-Land and TMT. Also designated as an issue was the question whether Sea-Land could lower its Jacksonville rates without doing so at other ports. Sea-Land never requested, nor did it object to the absence of, attention to TMT's rates in the orders defining the investigation.[6]

At the hearing, the Port of New York Authority intervened and contended that Puerto Rico traffic should carry the same rates whether Jacksonville or northern ports were involved and that any departure from this rule violated Section 16, First. TMT countered that it could not be considered in violation of Section 16, First, because it did not serve ports other than Jacksonville. TMT's legal contention was rejected by both the Examiner and the Commission.[7] There was discussion on the merits of the Section 16, First, issue—the Examiner finding no violation, and the Commission finding that not enough evidence was brought forward to adduce a violation. But although the matter is confused it seems that the Commission did not intend by this discussion to be broadening the scope of the investigation to consider Section 16, First, issues as such, but only to be considering the Section 16, First, question insofar as it related to the other issues specified by the orders for investigation.

6. Sea-Land could easily have brought the legality of TMT's rate structure into issue by lodging a formal complaint under 46 U.S.C. § 821 (1964). And since the report will not foreclose consideration of such a complaint, Sea-Land, if it is so advised, may proceed by this available statutory procedure. Such a proceeding would permit the creation of a record sufficient to enable a determination on port discrimination—a record which the Commission felt was lacking in this case.

7. Reduced Rates on Machinery and Tractors, 9 F.M.C. 465 (1966), was relied upon by the Commission.

On petition to review filed in this court, Sea-Land set forth in its questions presented and specification of errors that the Commission erred in finding that there was no violation of Section 16, First. But there is not a word on this point in its opening brief. The point is made briefly in the reply brief, but essentially only by way of argument that the discussion in the report that there was no Section 16, First, violation was inconsistent with the determination that Sea-Land could not have different rates for different mainland ports.

We conclude that this subsidiary point that TMT's rates violate Section 16, First, does not survive dismissal for lack of ripeness of the issues of which it was a small part.

We believe that under all the circumstances the petition for review should be dismissed for want of jurisdiction.

So ordered.