ENVIRONMENTAL DEFENSE FUND INC., Scenic Hudson Preservation Conference, Hudson River Sloop Clearwater, Inc., Federated Conservationists of Westchester County, Inc., and Rockland County Conservation Assoc., Inc., Plaintiff,

v.

James A. JOHNSON, Division Engineer, North Atlantic Division, U. S. Army Corps of Engineers, John W. Morris, Chief of Engineers, Clifford A. Alexander, Secretary of the Army, Defendants.

No. 79 Civ. 2228.

United States District Court, S. D. New York.

Aug. 3, 1979.

James T. B. Tripp, New York City, for Environmental Defense Fund Inc.

Butzel & Kass, New York City, for Scenic Hudson Preservation Conference.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants; John M. O'Connor, Jane E. Bloom, Asst. U. S. Attys., New York City, of counsel.

OPINION

GAGLIARDI, District Judge.

Plaintiffs, a consortium of public interest organizations concerned with the conservation of the nation's scenic and natural resources, commenced this action for declaratory and injunctive relief alleging that the defendants, the North Atlantic Division of the State Army Corps of Engineers and several of its officers, prepared plans for the Hudson River Skimming Project in violation of the Water Resources Planning Act ("WRPA"), 42 U.S.C. § 1962 et seq., the Northeast Water Supply Act ("NEWS"), 42 U.S.C. § 1962d–4, and the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§ 4332, and accompanying regulations.[1] Jurisdiction is premised upon each of these statutes as well as 28 U.S.C. § 1331. Plaintiffs have moved for a preliminary injunction pursuant to Rule 65(a), Fed.R.Civ.P., and defendants have moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P., for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. For the reasons discussed below, plaintiffs' motion is denied and defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R. Civ.P. is granted.[2]

### Statement of Facts

In 1965, Congress passed the NEWS Act, 42 U.S.C. § 1962d–4, authorizing the Army Corps of Engineers to prepare plans for meeting the future water needs of the large metropolitan areas in the United States. The Act also provides that such plans must be prepared in accordance with the WRPA, 42 U.S.C. § 1962. Pursuant to this mandate, the North Atlantic Division of the Corps of Engineers ("the Corps") studied the water supply problems of the Northeast, and, in 1975, issued an interim report which identified metropolitan areas with the most critical water supply problems. Sometime after the publication of the interim report, the Corps identified the Hudson River Skimming Project ("the HRP" or "the project") as "the most appropriate ear-

ly action" for the New York metropolitan area and released a draft environmental impact statement ("draft EIS") for the project. In November 1977, the Corps published the final NEWS report. The final report described the HRP in great detail and estimated that the HRP would take eight years and cost $4.6 billion to construct. The report included a two-volume technical study and a revised draft EIS for the project. In addition, the report recommended that the appropriate Corps official seek Congressional authorization for an $8 million, three to five year general design memorandum study ("Phase I Study") of the HRP.

On January 26, 1978, the Board of Engineers for Rivers and Harbors approved the Corps' recommendations with minor revisions. The report of the Board of Engineers, the final report of the Corps, and the revised DEIS were then circulated to other federal agencies for review. Later in 1978, the House Public Works Committee included in its version of the Water Resource Development Act authorization for the funding of the Phase I Study. Although that bill did not pass, the presently pending 1979 version of the bill also includes authorization for funding the Phase I Study.

The Corps does not intend to prepare a final environmental impact statement ("final EIS") until after the Phase I Study is completed; Congress is thus being asked to

---

1. 43 Fed.Reg. 55978–56007 (1978).

2. Although there is some law to the contrary, *see General Motors Corp. v. Volpe,* 321 F.Supp. 1112 (D.Del.1970), *citing United States v. Storer Broadcasting Co.,* 351 U.S. 192, 197, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), it appears that the dismissal of a complaint on the ground that an action is not ripe for judicial review is most appropriately treated by a Rule 12(b)(6) motion. "[T]he right of the petitioners to recover under their complaint will be sustained if the . . . laws of the United States are given one construction and will be defeated if they are given another. For this reason the district court has jurisdiction." *Bell v. Hood,* 327 U.S. 678, 685, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). There can be no doubt that this case "arises under" both NEPA and the other federal environmental legislation cited in the text accompanying note 1, and that 28 U.S.C. § 1331 confers subject matter jurisdiction upon the court. De-

fendants' principal grounds for moving for dismissal are that they have neither "proposed legislation for major federal action . . . ." within the meaning of Section 102 of NEPA nor undertaken "final agency action" within the meaning of Section 10(c) of the Administrative Procedure Act ("APA"). Since the APA is not an independent grant of subject matter jurisdiction, *see Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192, the alleged lack of finality under Section 10(c) certainly cannot deprive this court of jurisdiction to entertain plaintiffs' colorable claim under NEPA.

Because the defendants have addressed primarily the ripeness issue, and it is upon that ground that the court has granted defendants' motion to dismiss, the court need not consider whether or not plaintiffs have established that they have standing to challenge the agency action at issue in this case.

determine whether or not to proceed with the study on the basis of the Corps' final report and a revised draft EIS.

## Discussion

Plaintiffs allege, in sum and substance, that defendants have violated various provisions of the NEWS Act, 42 U.S.C. § 1962d–4, NEPA, 42 U.S.C. § 4332, and accompanying regulations, by seeking Congressional authorization for the Phase I Study prior to both (1) the preparation of a final EIS and (2) the Corps' consideration of alternatives to the HRP that could just as easily serve to alleviate the long term water needs of the New York metropolitan area. Notwithstanding the possible merit of these arguments, the court determines that the instant dispute is not ripe for judicial review.

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) directs that, to the fullest extent possible:

> . . . all agencies of the Federal Government shall include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by a responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> . . . . .
>
> (iii) alternatives to the proposed action,
>
> . . . . .
>
> and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Even a cursory reading of Section 102(2)(C) reveals that it not only sets forth the information that government officials must provide, but also embodies a timing device—a specific point in the administrative process at which compliance with its provisions is necessary:

> Under the first section of § 102(2)(c) the moment at which an agency must have a final statement ready "is the time at which it makes a recommendation on a *proposal* for federal action." *Aberdeen &*

*Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, [2356] 45 L.Ed.2d 191 (*SCRAP II*) (1975) (emphasis in original). The procedural duty imposed upon agencies by this section is quite precise, and the role of the courts in enforcing that duty is similarly precise.

*Kleppe v. Sierra Club,* 427 U.S. 390, 405–06, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976). Thus, if the plans for the HRP have not reached this statutorily fixed point, defendants are not yet required to comply with section 102(2)(C) and judicial intervention to correct alleged violations of NEPA would be clearly premature.

This court is hardly writing on a blank slate in determining whether or not a proposal for legislation that authorizes further study of a contemplated project is a "proposals for legislation or major Federal actions significantly affecting the quality of the human environment" within the meaning of section 102. First, there is substantial authority for the proposition that the term "proposal" encompasses action much more closely tied to the impending implementation of a specific project than can ever be involved in the authorization of funds for *further study.* In *Kleppe,* several environmental groups claimed that government officials could not allow further development of the coal reserves in the North Great Plains region as contemplated by the North Great Plains Resource Program and a national coal leasing plan without preparing a regional EIS in accordance with NEPA. Rejecting the balancing test devised by the Court of Appeals for the District of Columbia for determining at what point "during the germination process" an agency must file an EIS, the Supreme Court held that the term "proposal" in section 102 did not encompass ". . . the contemplation of a project and the accompanying study thereof." 427 U.S. at 427, 96 S.Ct. at 2728.

■ Most recently in *Andrus v. Sierra Club,* —— U.S. ——, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), the Supreme Court again stressed the precise meaning of the term "proposal". In *Andrus,* respondents

alleged that reduced appropriation requests of the National Wildlife Refuge System constituted a "proposal for major federal action." The Supreme Court disagreed since "appropriation requests do not *'propose'* federal actions at all; they instead fund actions already proposed." ——— U.S. at ———, 99 S.Ct. at 2343 (emphasis added). Section 102 is thus best interpreted, according to the Court, "as applying to those recommendations or reports that actually propose programmatic actions", . . . "[The Office of Management and Budget's ("OMB")] determination to cut the [Wildlife] Service's budget is not a programmatic proposal, and therefore requiring OMB to include an EIS in its budgetary cuts would be premature." *Id.* Applying this standard to the situation presented in the case at bar, the court determines that the final NEWS report, which merely recommends Congressional authorization to fund a *further study* of the HRP, is not a recommendation that "actually proposes programmatic actions," necessitating compliance with section 102 at the present time.[3]

■ The analysis employed by the Supreme Court in *Aberdeen, Kleppe* and *Andrus*, stressing the precise obligations that section 102 imposes upon federal agencies and the equally precise role of the judiciary in the enforcing of those obligations, is simply a restatement of the well settled principle that a challenge to an agency program is not ripe for adjudication unless the agency has taken "final action" within the meaning of Section 10(c) of the Administrative Procedure Act. 5 U.S.C. § 704. *See Association of Community Organizations for Reform Now v. Southeastern Pennsylvania Transportation Authority,* 462 F.Supp. 879, 883–84, 885 (E.D.Pa.1978). In the instant action, although plaintiffs concede that "defendants have failed to make a final decision on the [Hudson River] [P]roject" (Complaint ¶ 35), they nonetheless contend that the completion of the main report and the recommendation of federal officials to proceed with the Phase I Study constitutes "final agency action." The court disagrees. A decision to seek funding for the Phase I Study no doubt represents a determination that a large commitment of time, money, and resources should be made in order to explore a solution to the region's water supply problem. Such activity, however, is not equivalent to final agency action since the Corps will undoubtedly submit another report after the proposed study is completed with a recommendation either to construct or not to construct the HRP. Until that time, the defendants continue to study whether or not to take final action, and thus, the matter is not yet ripe for judicial review. *See Committee Against Railroad Relocation v. Adams,* 471 F.Supp. 142 (E.D.Ark.1979)[4] Plaintiffs argue, how-

---

3. Recently amended regulations implementing the provisions of NEPA also support this view. Section 1508.22 of the Council of Environmental Quality's NEPA guidelines formerly provided that a "proposal" exists when an agency is "actively considering alternatives." Several commentators, however, expressed the view that this phrase could be interpreted to mean that a proposal exists before the agency makes a decision to proceed with the project.

In response to this concern, and to emphasize the link between EISs and actual agency decisions, the Council deleted the phrase "actively considering" and replaced it with the phrase "actively preparing to make a decision on 'alternatives.'"

43 Fed.Reg. 55989 (1978) (comment on § 1508.-22) (emphasis added).

Even assuming *arguendo* that the Phase I study is a proposal for action within the meaning of Section 102, plaintiffs have made no showing that performance of the Study will in any way "affect . . . the quality of the human environment." While plaintiffs allege that the *construction* of the HRP will have adverse environmental consequences, these allegations certainly do not show that the pending proposal for legislation authorizing *further study* of the HRP will have the same adverse effects.

4. In *Adams*, plaintiffs sought to enjoin, *inter alia,* the Department of Transportation from relocating a substantial amount of railroad tracks in accordance with the Pine Bluff Demonstration Project by arguing that the defendants had not complied with the requirements of NEPA. The Court noted that the defendant had not yet approved the demonstration project and that the only significant actions that the defendants had taken were:

(1) the decision to make Federal funds available for preliminary engineering studies, including an evaluation of the potential social,

ever, that the Corps has already decided that the HRP is the best alternative to meet the region's water supply problems, and that the Phase I Study, rather than addressing fundamental questions concerning the desirability of constructing the HRP, is likely to address only issues of considerably less importance to the ultimate decision to proceed with the project such as selecting sites for pipeline alignments and reviewing developments in intake design.[5] Although part of the description of the Phase I Study embodied in the NEWS report offers some support for this view,[6] the report also states that the scope of the three to five year, $8 million Phase I Study would permit the defendants to:

> (1) Review project formulation including: updating of population, economic base, water use and conservation data; *evaluation of alternatives*; hydrologic basis for project operations and salinity intrusion control.

Final NEWS Report at I–54 (emphasis added). In responding to this point, plaintiffs contend that it is unclear what a review of the project formulation would entail since "the only alternatives discussed in the NEWS report are 'no action' and 'different tunnel routes'" (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dis-

miss, at 22). Suffice it to say that even if the defendants formerly rejected these alternatives, and even if the scope of the Phase I Study is "oriented towards *some form* of HRP", *id.*, the possibility still exists that the HRP either may be abandoned or significantly altered after the Phase I Study is completed. In short, the defendants have not yet taken "final agency action" with respect to the HRP, and judicial intervention "during the germination process" of the project is likely to hazard unnecessary disruption of agency plans. *See Kleppe v. Sierra Club, supra*, 427 U.S. at 406, 96 S.Ct. 2718.[7]

Accordingly, defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R. Civ.P., is granted.

So Ordered.

---

economic and environmental consequences of various alternative courses of action, and (2) Federal approval of a draft EIS for the Pine Bluff proposal.
*Id.* at 144. Denying plaintiffs' request for preliminary relief and granting defendants' motion to dismiss, the court held that "[b]ecause defendants have neither completed the procedures mandated by NEPA nor reached a final decision as to the specific means of implementing the proposed project, no justiciable case or controversy exists." *Id.* at 146.

5. *See* Final NEWS Report at I–54, § 2–8.

6. In recommending Congressional authorization for the Phase I Study, the final NEWS report noted that "there are questions and issues which, while not critical in the assessment of feasibility, require further resolution prior to construction." Final NEWS Report at I–54.

7. Defendants rely on *Toilet Goods Ass'n. v. Gardner*, 360 F.2d 677 (2d Cir. 1966) *aff'd in*

two opinions, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), for the proposition that even if this court concludes that final agency action has not yet occurred, it nonetheless may review what the defendants have done to this point (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 11–12). The *Toilet Goods* decision, however, simply does not stand for this proposition since it was uncontroverted that the challenged agency action involved in that case—the adoption of certain food and drug regulations—constituted final agency action. The issue decided in *Toilet Goods*, which offers little help to the plaintiffs in the instant action, was whether or not the controversy was ripe, *despite* the fact that the agency had taken final agency action, when the regulations in question were not yet in effect. *Id.* at 683–84.