629 F.2d 239
 14 ERC 2025, 10 Envtl. L. Rep. 20,737
 ENVIRONMENTAL DEFENSE FUND, INC., Scenic Hudson Preservation
Conference, Hudson River Sloop Clearwater, Inc., Federated
Conservationists of Westchester County, Inc., and Rockland
County Conservation Assoc., Inc., Plaintiffs-Appellants,
v.
James A. JOHNSON, Division Engineer, North Atlantic
Division, U. S. Army Corps of Engineers, John W.
Morris, Chief of Engineers, Clifford A.
Alexander, Secretary of the
Army, Defendants-Appellees.
 No. 781, Docket 79-6206.
 United States Court of Appeals,
Second Circuit.
 Argued March 17, 1980.
Decided Aug. 13, 1980.
 
 A. Stephen Hut, Jr., Washington, D. C. (Wilmer & Pickering, Washington, D. C., Daniel K. Mayers, Washington, D. C., and Jonathan Becker, James T. B. Tripp, New York City, Environmental Defense Fund, Butzel & Kass, New York City, of counsel), for plaintiffs-appellants.
 Jane E. Bloom, New York City (Robert F. Fiske, Jr., U. S. Atty. for the Southern District of New York, Peter C. Salerno, Asst. U. S. Atty., of counsel), for defendants-appellees.
 Before MULLIGAN and OAKES, Circuit Judges, and POLLACK, District Judge.*
 MULLIGAN, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Southern District of New York, Hon. Lee P. Gagliardi, Judge, which denied plaintiffs' motion for a preliminary injunction and granted defendants' motion to dismiss the complaint. In a decision reported at 476 F.Supp. 126, the court below concluded that the suit was not ripe for judicial review. We agree.
 
 
 2
 In 1965, Congress passed the Northeastern United States Water Supply ("NEWS") Act, 42 U.S.C. § 1962d-4, which recognized that "assuring adequate supplies of water for the great metropolitan centers of the United States has become a problem of such magnitude that the welfare and prosperity of this country require the Federal Government to assist in the solution of water supply problems." The Act authorized the Secretary of the Army, acting through the Chief of Engineers, to prepare plans pursuant to the Water Resources Planning ("WRP") Act (42 U.S.C. § 1962 et seq.) to meet the long range water supply needs of the northeastern United States, in cooperation with federal, state and local agencies.
 
 
 3
 In accordance with this mandate, the North Atlantic Division of the Corps of Engineers ("the Corps") studied the water supply and demand problems of the Northeast, and in 1975 produced an Interim NEWS Report which identified those major metropolitan areas with the most urgent need for additional supplies of water. After the Interim Report was published, the Corps recommended a specific "early action project" for the New York metropolitan area the Hudson River Skimming Project ("HRP").[1] In July 1977, the Chief of Engineers issued a Draft Environmental Impact Statement ("DEIS") for the HRP. Later that year, the Corps released a Final NEWS Report[2] which described the HRP at length and estimated that the project would take eight years and cost $4.6 billion to construct. The Final NEWS Report further noted that certain questions, such as the projected water demand for the region under study, were beyond the scope of the report in terms of expense and time required. Therefore, the Final Report recommended that the Corps seek Congressional authorization for a three to five year eight million dollar Phase I General Design Memorandum Study of the Hudson River Project ("Phase I Study").
 
 
 4
 In January 1978, the Board of Engineers for Rivers and Harbors approved the Corps' recommendations. The report of the Board of Engineers, the final report of the Corps, and the revised DEIS have been circulated to other federal agencies for review. In addition, the Final NEWS Report is currently under review by the Water Resources Council, an interagency body established under the WRP Act (42 U.S.C. § 1962a) to coordinate the planning and development of water projects on the federal level. Congress has not yet authorized funding for the Phase I Study. The Corps does not intend to issue a final environmental impact statement ("final EIS") until the Phase I Study has been completed.
 
 
 5
 Plaintiffs-appellants Environmental Defense Fund, Inc., Scenic Hudson Preservation Conference, Hudson River Sloop Clearwater, Inc., Federal Conservationists of Westchester County, Inc., and Rockland County Conservation Association, Inc. are all public interest conservation organizations committed to the protection of the environment and natural resources of this nation. They commenced this action against defendants, the North Atlantic Division of the State Army Corps of Engineers and several of its officers, seeking declaratory and injunctive relief. Plaintiffs alleged in their complaint that defendants violated the WRP Act, 42 U.S.C. § 1962 et seq., the NEWS Act, 42 U.S.C. § 1962d-4, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and certain accompanying regulations[3] by attempting to obtain Congressional authorization for the Phase I Study 1) prior to the preparation of a final EIS and 2) without consideration by the Corps of other drought protection alternatives to the HRP that could also solve the water supply problems of the New York metropolitan area. Plaintiffs complained that this failure to consider a range of objectives resulted in the Corps' failure to prepare an "Environmental Quality Plan" as required by regulations promulgated by the Water Resources Council and the Corps itself.[4] Plaintiffs moved before the district court for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), and defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). As noted above, Judge Gagliardi dismissed the complaint pursuant to Rule 12(b)(6), concluding that the case was not ripe for judicial review. We affirm.
 
 
 6
 In determining whether an administrative action is final and judicially reviewable within the meaning of section 10(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, the Supreme Court has indicated that the finality requirement is to be interpreted in "a pragmatic way." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The Court has also stated that in determining finality we must decide "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).
 
 
 7
 An application of these principles here, as well as common sense, compels the conclusion that the Corps' issuance of a report recommending a further study of the HRP, which it is estimated will take three to five years to complete and cost eight million dollars, cannot possibly be characterized as a "final agency action" within the meaning of section 10(c) of the APA. The Corps NEWS Report does not recommend the construction of the HRP, nor does it advocate any other definitive action with respect to the project. The Report simply seeks funds from Congress for further study of the HRP. If Congress doesn't grant the funds, the HRP cannot be constructed and judicial intervention will have been totally unnecessary.[5]
 
 
 8
 Even if funds are made available, the proposed Phase I Study may reaffirm the HRP, reform it, or even recommend that it not be constructed. We are here asked to intervene in an administrative process which at this point has created no rights or obligations and involves no legal consequences. As Judge Gagliardi observed, "the possibility still exists that the HRP either may be abandoned or significantly altered after the Phase I Study is completed." 476 F.Supp. at 130.
 
 
 9
 We conclude that no final agency action has been taken, that the issues are not ripe for adjudication and that our intervention would not only be a waste of judicial resources but an untoward interference in the administrative process.
 
 
 10
 Appellants also argue that section 102(2)(c)[6] of NEPA requires that the Corps prepare a final environmental impact statement at this time. This contention was properly rejected by Judge Gagliardi. A proposal for legislation which would simply authorize further study of a contemplated project is clearly not one "significantly affecting the quality of the human environment." While a recommendation that the HRP be constructed may have such an impact, a proposal seeking funds for further study has no impact on anything. The NEWS Act Study indicates that there is presently insufficient data to determine completely the impact of the HRP on the environment and that concerns have been expressed that the projected water demand for the region under study may be too high. At this point we cannot understand how alternatives to HRP can be meaningfully evaluated. Not knowing what the dimensions of HRP may be, it is unrealistic at this time to discuss the viability of alternative projects. See Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).
 
 
 11
 Accordingly, the decision of the district court granting the Corps' motion to dismiss the complaint is affirmed.
 
 OAKES, Circuit Judge (dissenting):
 
 12
 I respectfully dissent. The majority holds that the "Final NEWS Report," which the Corps itself calls "the final report to be prepared under authority of (the NEWS Act)," is not final agency action. It therefore, the majority holds, does not warrant judicial review at this time to determine whether there has been compliance with that Act and the Water Resources Planning Act, as well as with the Corps' own planning regulations. Although one might initially think that a call for further study can never be final, I am convinced that review is warranted at this time because, as I see it, the "final report" completes the planning process under the NEWS Act and effectively precludes the consideration of alternatives other than the Hudson River Skimming Project (HRP) or "no action."
 
 
 13
 The NEWS Act authorizes the Corps' Chief of Engineers "to cooperate with Federal, State, and local agencies in preparing plans in accordance with the Water Resources Planning Act," 42 U.S.C. § 1962d-4(a), and only permits construction of projects under the Act "which are recommended in the plan prepared in accordance with subsection (a) of this section," id. § 1962d-4(b). Such a plan must be prepared in accordance with the Water Resources Council's Principles and Standards, id. § 1962a-2 (known as the "Water Resources Planning Act"); 38 Fed.Reg. 24,778 (1973), and the Corps of Engineers' own regulations, 33 C.F.R. pt. 290. See also id. pt. 292 (relating to "Problem Identification"); id. pt. 293 (relating to "Formulation of Alternatives"). These regulations call for a three-stage planning process; the first stage involves a "Reconnaissance," the second the "Development of intermediate plans," and the third the "Development of detailed plans." Id. § 290.10. See also id. § 290.7 (a chart refers to stage 3 as "Development of detailed plans and plan selection"); pt. 291. In particular, § 291.7 discusses selection of the "best plan for implementation" following the evaluation of alternatives and trade-off analysis. Id. § 291.7(a)(2), (b).
 
 
 14
 Thus, when a final NEWS report is completed, as here, the next step may well involve only technical engineering considerations relating to the project specifically recommended in the NEWS report. That is to say, if Congress votes the money for the "Phase I Study," it is quite possible that the resulting study will not include any consideration of alternatives to the HRP, but only a determination of how specifically to build it, or a decision not to build it at all. In this way, planning under the NEWS Act and planning under the "Phase I Study" have two distinctly different scopes and purposes: The NEWS report serves to identify a solution to the macro problem of water supply in a given region by studying a range of alternatives until one appears the most favorable, while future analysis under the "Phase I Study" relates only to the carrying out of that particular solution.[1] As the NEWS report itself states, "(t)he Corps of Engineers has identified a specific project recommendation for an early action project for the (New York Metropolitan Area): the Hudson River Project." Again, the report later makes plain that the Corps considered about 100 alternatives at the outset before whittling down the number of acceptable projects to 16, and then finally recommending the HRP. In discussing post-authorization planning in the Appendix to the NEWS report, the Corps notes:
 
 
 15
 The primary objective of a survey report (final NEWS report) is the establishment of the feasibility and desirability of a considered project. The project must have been shown to constitute the best available alternative to meet a demonstrated resource development need. It is concluded that the present study has accomplished this objective. However, there are questions and issues which, while not critical in the assessment of feasibility, require further resolution prior to construction.
 
 
 16
 We simply have no way of knowing whether any alternatives would be considered in the "Phase I Study" for which congressional authorization is sought. The Corps' own draft regulations, transmitted by the Acting Chief of the Corps' Planning Division to the Division Engineer, North Atlantic on January 8, 1976, defines the "Phase I Advanced Engineering and Design Study" as follows:
 
 
 17
 "Affirmation Phase I AE&D Study" denotes a study in which changes in purpose or significant changes in the scope of the authorized project are neither anticipated nor made and therefore there is no reformulation of the authorized project (or elements thereof).
 
 ER1105-2-30(4)(a) (emphasis added).[2]
 
 18
 To be sure, the draft regulations also refer to a "Reformulation Phase I AE&D Study" which "denotes a study in which there are changes in purpose or significant changes in scope from the authorized project." ER1105-2-30(4) (f). Presumably the Corps can determine in advance whether an authorized project is up for "Affirmation" or "Reformulation." But at this point we do not know what the Corps has in mind for the HRP "Phase I Study." The NEWS report itself gives no indication which type of study this would be.[3] Although EDF acknowledged that "defendants have failed to make a final decision regarding the project," P 35 of Complaint, EDF did allege that the HRP planning methodology
 
 
 19
 will in all likelihood culminate either in authorization and construction of the Hudson River Project generally as proposed by defendants, with its adverse impact, or no action, with its own potentially adverse impacts,
 
 
 20
 P 11(c) of Complaint. The complaint also alleged that
 
 
 21
 the only alternatives addressed in the Revised DEIS relate to different routes for the conveyance tunnel and locations for the treatment plant. The "no action" alternative is mentioned, but is concluded to result in an economic catastrophe should a drought occur.
 
 
 22
 P 45 of Complaint.
 
 
 23
 Since the district court dismissed the case below pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, we must accordingly accept that the complaint's allegations are true. As such, we also have to assume on the face of the pleadings that an "Affirmation Phase I AE&D Study" is contemplated.
 
 
 24
 Apparently the district court was willing to accept EDF's contention that the "Phase I Study" would result in some form of HRP, or no action, and still found no final agency action:
 
 
 25
 A decision to seek funding for the Phase I Study no doubt represents a determination that a large commitment of time, money, and resources should be made in order to explore a solution to the region's water supply problem. Such activity, however, is not equivalent to final agency action since the Corps will undoubtedly submit another report after the proposed study is completed with a recommendation either to construct or not to construct the HRP.
 
 476 F.Supp. at 129. The court added:
 
 26
 Suffice it to say that even if the defendants formerly rejected these alternatives, and even if the scope of the Phase I Study is "oriented towards some form of HRP," id., the possibility still exists that the HRP either may be abandoned or significantly altered after the Phase I Study is completed.
 
 
 27
 Id. at 130.
 
 
 28
 To my mind it is precisely the rejection of alternatives to the HRP in the final NEWS report, coupled with the absence of any likelihood of reconsideration of them, that makes this final agency action reviewable under 5 U.S.C. § 704. Finality and the related and overlapping doctrine of ripeness, see Aquavella v. Richardson, 437 F.2d 397, 403 (2d Cir. 1971), which are both governed by pragmatic considerations, Fidelity Television, Inc. v. FCC, 502 F.2d 443, 448 (D.C.Cir.1974); Sea-Land Service, Inc. v. Federal Maritime Commission, 402 F.2d 631, 633 (D.C.Cir.1968), call for a five-prong analysis:
 
 
 29
 1) whether the agency action is final in a functional sense, even though other agency actions may follow, cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 150-51, 87 S.Ct. 1507, 1516-1517, 18 L.Ed.2d 681 (1967) (discussing cases finding final agency action where agencies promulgated general policies but had not yet applied them to specific individuals);
 
 
 30
 2) whether postponed review would frustrate the key purposes of the applicable statute for which review is sought, Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 82, 98 S.Ct. 2620, 2632, 57 L.Ed.2d 595 (1978);
 
 
 31
 3) whether the issues presented are purely "legal," Abbott Laboratories, supra, 387 U.S. at 149, 87 S.Ct. at 1515, and therefore of a nature particularly amenable to judicial review;
 
 
 32
 4) whether the agency action has present consequences that would adversely affect the parties if review were postponed, id.; and
 
 
 33
 5) whether review would disrupt the orderly and effective process of agency administration and adjudication, Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970); Aquavella v. Richardson, supra, 437 F.2d at 404.
 
 
 34
 In the instant case, I believe each of the five prongs has been met. First, the action is "final" both absolutely under the NEWS Act, see 33 C.F.R. § 291.7 ("primary documentation in Stage 3 will be the draft and final study report"), and functionally because it effectively forecloses consideration of true alternatives to the HRP, see note 1 supra. Second, the statutory purpose is best served by immediate rather than postponed review. The Corps' cumulative planning process results in the embedding of any early mistake into and throughout the remainder of the process. For example, EDF'S complaint alleged that the Corps failed to adopt as required by regulation a range of planning targets in estimating water demand by the year 2000. EDF argued that the Corps made an arbitrary assumption in estimating the water supply shortfall in the year 2000 by subtracting the water yield during the worst drought ever recorded from the predicated demand for the year 2000, whereas such a drought occurs at highly infrequent intervals. PP 42, 43 of Complaint.[4] If uncorrected early in the planning process, such an assumption would necessarily skew all subsequent analysis and result in consideration of projects producing greater amounts of water supply than may actually be needed. EDF also alleged that the Corps had failed to prepare an "Environmental Quality Plan," contrary to the Principles and Standards and hence the WRP Act, thereby precluding the informed consideration of alternatives and trade-offs by the public or by Congress required by the regulations. See, e. g., 33 C.F.R. § 290.11.
 
 
 35
 Third, the issues raised are legal in character whether the Corps' actions have violated applicable statutes and regulations. See National Wildlife Federation v. Snow, 561 F.2d 227, 236 (D.C.Cir.1976). We would not be thrusting ourselves into an area requiring great expertise and knowledge. Instead we would be deciding simply whether or not the Corps considered, for instance, a range of targets as required by the Principles and Standards. It is hard to see how later review would put us in a better position to decide such claims on the merits.
 
 
 36
 Fourth, there is substantial impact upon the parties and public if review is postponed. The contemplated "Phase I Study" will take three to five years, and this delay alone may cause harm if other possible alternatives are meanwhile foreclosed because of the lead time necessary to their implementation. Cf. Regional Rail Reorganization Act Cases, 419 U.S. 102, 145, 95 S.Ct. 335, 359, 42 L.Ed.2d 320 (1974) (where court said that delay in consideration of the validity of conveyance provisions would create risk that future consideration would be too hasty to protect rights or too late to prevent conveyance). Of course, if EDF's allegations of an erroneous planning process are correct, the Study will involve the useless expenditure of substantial funds that could be avoided by detection of mistakes now.
 
 
 37
 Fifth, I do not see how review now would work great hardship on the Corps' orderly processes. If we reviewed now, and EDF proved its case, then the Corps would be required to reopen the NEWS study and review alternatives, in which instance:
 
 
 38
 1) the Corps might end up with the same result, and there would have been some delay in time; or
 
 
 39
 2) the Corps might end up with a different conclusion, thereby saving $8 million and five years of wasted agency study time.
 
 
 40
 But more importantly, note what happens if we wait until the Phase I Study is complete:
 
 
 41
 1) If the Corps recommends construction, then EDF will be back asking for review. If it proves its case, then the Corps will have to reopen the NEWS process. Even if it still concludes that the HRP is the best alternative, the total delay to the agency is the same as allowing judicial review now: in one case, review now plus five years; in the other, five years plus review then.[5] But even worse the Corps may decide on a totally different alternative requiring yet another expenditure of time and money on a second "Phase I Study."
 
 
 42
 2) If the Corps recommends no action and abandons the HRP, EDF will still be back asking for review. EDF could properly claim that the "no action" decision represents a proposal for action, i. e., the Corps' solution under the NEWS Act has been to do nothing at all. Certainly at some point, the court would have to review the Corps' inaction, since the water supply problem grows every year, and EDF claims that a five-year delay may cause serious water supply problems at that time.
 
 
 43
 Of course I am aware that an agency like the Corps of Engineers may well like to postpone judicial review of its actions and plans until there is enough time, energy, and effort spent on them to make a compelling case, if not in the courts at least in the Congress, for completion of the project. The Tellico Dam is but one recent example of the persuasiveness of momentum and dollars already invested. Compare Tennessee Valley Authority v. Hill, 437 U.S. 153, 172-73, 98 S.Ct. 2279, 2290-2291, 57 L.Ed.2d 117 (1978) (explicit provisions of Endangered Species Act require permanent halting of Tellico Dam, to protect three-inch snail darter, even though $100 million project was virtually complete), with Endangered Species Act Amendments of 1978, 16 U.S.C. § 1539(i) (1) (1978) (amending original 1973 Act in response to Supreme Court case, by directing Endangered Species Committee to consider granting exemption from requirement of Act to the Tellico Dam project). I thus am gravely concerned that, in affirming the district court's decision, we may effectively be holding that anything short of recommending construction could never constitute final agency action. No matter how remote the chance a project may in fact be abandoned, that very possibility would suffice to preclude judicial review. An astute agency, I fear, would take great advantage of such a rule, by deferring formal decision on a project until the last possible moment, even though it fully planned to build the project. Note that in the instant case, all the architectural and engineering work could be completed in the "Phase I Study," prior to any formal recommendation to construct a project. Yet, I can see no real functional difference if the agency made a formal decision to construct the project before such studies after all, the Corps could still abandon or significantly alter the HRP during the time of the studies, but before the first brick is laid.[6]
 
 
 44
 In short, I believe that, regardless of future Corps or congressional action, the public will be disserved by the Corps' alleged failure to comply with mandated planning procedures to date. This failure, if it has indeed occurred, will result in the prevention of developing a meaningful solution or series of solutions to the water problems of New York.
 
 
 45
 I would thus reverse the 12(b)(6) dismissal and remand for consideration on the merits, by way of summary judgment if appropriate. If the Corps can show that the proposed "Phase I Study" will include a reconsideration of the alternatives first analyzed under the NEWS Act planning process, i.e., that it will be a "Reformulation" study, then I see no need for judicial intervention now. I would not reach the NEPA issue at this time.
 
 
 
 *
 United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The HRP was proposed by the Corps as a solution to drought problems in the New York metropolitan area. The HRP would take, or "skim," water from the Hudson River at a point about 80 miles above the Battery in New York City during high flow periods, treat the water at a filtration plant, and then convey it by deep tunnel to Kensico Reservoir in the New York City System in Westchester County
 
 
 [2]
 The Final NEWS Report is comprised of a Main Report, a Summary Report, a revised DEIS, and a two-volume Technical Report
 
 
 [3]
 These include the "Principles and Standards for Planning Water and Related Land Resources," 38 Fed.Reg. 24778 (1973), promulgated by the Water Resources Council pursuant to the WRP Act, and regulations promulgated by the Corps of Engineers in order to implement the principal features of the Principles and Standards, 33 C.F.R. Parts 290-95, 393 (1979)
 
 
 [4]
 38 Fed.Reg. 24786; 33 C.F.R. § 293.7(d), (e)
 
 
 [5]
 We cannot agree with our dissenting brother's reasoning that the agency action in this case was final. The Main Report under the NEWS Act states that the Phase I Study "will be required to reassess the need for the (HRP)." (See Main Report at 1-54). Further, the NEWS Act Study specifically deferred the "evaluation of alternatives" from the feasibility study for accomplishment in the Phase I Study. It would seem that the Corps should be given the opportunity to complete its Phase I Study and define the specific formulation of the HRP it may recommend to Congress before this court enters into the picture
 
 
 [6]
 Section 102(2)(c) requires federal agencies to:
 include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 (i) the environmental impact of the proposed action.
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented.
 (iii) alternatives to the proposed action.
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 [1]
 This distinction is especially compelling when framed in terms of traditional planning process theory. One commentator describes:
 A major feature of change in approaches to plan-making over the past decade has been the introduction of systemic approaches which attempt to provide a rational methodology for decisions relating to the solution of planning problems. These approaches can take a number of forms, but the general stages they involve can be outlined as follows:
 (a) Definition and clarification of future problems and the interrelationships between them.
 (b) Identification of future conditions which might arise from the problems identified.
 (c) Identification of constraints which determine the range of possible solutions to the problems.
 (d) Determination of goals and objectives which plans are meant to achieve.
 (e) Formulation of alternative ways of achieving the goals and objectives which plans are meant to achieve.
 (f) Evaluation of the alternatives.
 (g) Recommendation of preferred alternatives.
 Crook, Physical Planning, in The Spirit and Purpose of Planning 119 (M. Bruton ed. 1974) (footnote omitted).
 As can readily be seen, the final stage in the traditional rational planning methodology is the recommendation of preferred alternatives, exactly what the Corps has done here. In a functional sense, then, the true planning process is complete.
 
 
 [2]
 The draft regulations state further:
 g. "Significant changes in Scope" are defined in para. 4a, App. I, ER1165-2-305.
 
 
 [5]
 Program Objective. The objective of the Phase I AE&D Program is to bridge the gap between the time when a feasibility (survey) report is completed and the initiation of detailed engineering and design of the authorized plan. This gap is often several years, during which time changes may occur which require identification, assessment, and evaluation in order to insure that the best plan is proposed for Federal participation. The Phase I AE&D study seeks to either affirm the validity of the authorized plan in light of current conditions and criteria, or to reformulate the plan as required by such conditions and criteria
 a. If no changes have occurred, or if changes do not significantly impact the authorized plan, Phase I AE&D studies should not unduly delay initiation of detailed engineering and design (Phase II AE&D).
 b. If changes have occurred which may significantly affect the authorized plan, or if deficiencies have been noted in the feasibility report, studies should be pursued under the Phase I AE&D Program to the extent necessary to reevaluate the feasibility report to affirm the validity of the project, to reformulate the project, or to recommend no further action on the project. This reevaluation must be accomplished prior to proceeding with detailed engineering and design studies.
 ER1105-2-30(4), (5).
 
 
 [3]
 The Appendix to the final NEWS report, in describing the proposed "Phase I Study," talks predominantly about engineering and siting issues. Although it does mention "consideration of alternatives," we have no way of knowing whether "alternatives" means tunnel routes for the Hudson River Project, or totally different structural and non-structural solutions to the water shortage problem for the Hudson River basin area. The Corps states:
 Several categories of detailed study will be required for the Hudson River Project. A Phase I General Design Memorandum (GDM) will be required to reassess the need for the project; review of the project formulation, hydrologic basis and consideration of alternatives; establish more definitively the extent of the environmental effects of construction and operation; obtain data for process design and waste disposal; obtain data for design of intake, pumping station, treatment plant, tunnels and pipeline; perform geologic reconnaissance and boring programs for selection of sites of facilities.
 The following items of work will be accomplished in the Phase I GDM.
 (1) Review project formulation including: updating of population, economic base, water use and conservation data; evaluation of alternatives; hydrologic basis for project operations and salinity intrusion control.
 (2) Perform geologic reconnaissance and borings needed to select facility sites, disposal sites, borrow pits, tunnel and pipeline alignments.
 (3) Perform field inventories of aquatic biota at potential intake sites, and similar inventories of flora and fauna at other facilities' sites.
 (4) Review developments in intake design; design, construct and operate a pilot intake.
 (5) Operate process design pilot plant to obtain data for treatment plant design; conduct raw water and finished water quality investigations; determine sludge characteristics for disposal area design.
 (6) Review environmental effects at each facility site including land use, recreational features and transportation; review archaeological, cultural and historic aspects; review results of aquatic and terrestrial environmental inventories; establish ecological criteria for site selection and make final preconstruction assessment of environmental impacts.
 (7) Review hydraulic and structural analysis of City Tunnel No. 3 as basis for design of Stages 2 and 3. Include field inspection and obtain data for completion of Stage 1.
 (8) Perform design memo scope design of project facilities and prepare cost estimate.
 (9) Complete Phase I GDM as basis for authorization for construction.
 The cost of the Phase I studies is estimated to be $8 million.
 
 
 [4]
 Erroneous arbitrary assumptions have been made in other contexts of major federal action. For example, the "Storm King" license granted in Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972), was based in part on the erroneous assumption that the Hudson River at Cornwall, N.Y., which is in fact a tidal estuary "flows only downstream," Hudson River Fishermen's Ass'n v. FPC, 498 F.2d 827, 831 (2d Cir. 1974)
 
 
 [5]
 To the extent that review now may reorient the "Phase I Study" or turn it into a "Reformulation AE&D Study," such a change in the agency's direction is far better now than it would be years hence, after countless additional studies and public hearings. Cf. Harlem Valley Transp. Association v. Stafford, 500 F.2d 328, 335 (2d Cir. 1974) (delay in review would have serious consequences if court found procedures inadequate after several hundred proceedings were held)
 
 
 [6]
 The fact that Congress has not yet approved funding for the "Phase I Study" does not persuade me that there has been no final agency action. If this were so, then no proposal to Congress, for either construction or study, would be reviewable until after Congress appropriated funds for the project. Since a congressional decision here would be predicated in large part on the Corps' own recommendations, it is incumbent upon us to ensure now that the agency has properly followed its own regulations and procedures, as it is required to do. In any event, I note that § 704 of the APA talks in terms of "final agency action," not final congressional action. 5 U.S.C. § 704 (emphasis added)