**NATIONAL WILDLIFE FEDERATION; Eastern Connecticut Citizens Action Group, Inc.; Stop I–84, Inc., of Rhode Island; Connecticut Committee of Correspondence, Inc.; Connecticut Fund For the Environment, Inc.; Connecticut Wildlife Federation; Save Our State Committee, Inc.; and Sierra Club**

v.

**Neil GOLDSCHMIDT, Secretary of Transportation; Robert E. Kirby, Regional Federal Highway Administrator, Region 1; Donato J. Altobelli, Division Administration for Connecticut, Federal Highway Administration; and Arthur B. Powers, Commissioner, Connecticut Department of Transportation.**

Civ. A. No. H 80–47.

United States District Court,
D. Connecticut.

Nov. 19, 1980.

---

8. *See* note 6, *supra*.

David G. Burwell, Washington, D. C., Haynes N. Johnson, Parmalee, Johnson, Bollinger & Bramblett, Stamford, Conn., Daniel Millstone, New Haven, Conn., Arlene Violet, Providence, R. I., for plaintiffs.

Frank H. Santoro, Asst. U. S. Atty., Richard Blumenthal, U. S. Atty., for the District of Connecticut, New Haven, Conn., Ezra D. Rosenberg, Atty., Land and Natural Resources Division, U. S. Dept. of Justice, Washington, D. C., for defendants Neil Goldschmidt, Robert E. Kirby and Donato J. Altobelli.

Kenneth N. Tedford, Susan T. Pearlman, Asst. Attys. Gen., Carl R. Ajello, Atty. Gen. of the State of Connecticut, Wethersfield, Conn., for defendant Arthur B. Powers.

Thomas C. Clark, Grant H. Miller, Jr., Clark, Mayo & Gilligan, Hartford, Conn., for amicus curiae I–84 Yes, Inc.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

### Introduction

At issue in this case are the plans of the United States Department of Transportation ("DOT") for three segments of Interstate Route 84 ("I–84") east of Hartford, Connecticut. The three proposed segments of I–84 which the plaintiffs challenge here are part of a plan to extend I–84 from its present terminus in East Hartford, Connecticut, to Providence, Rhode Island.

On January 28, 1980, the plaintiffs, each of which is an organization or corporation interested in environmental issues affecting Eastern Connecticut or Rhode Island, filed this action. They seek judicial review of a decision by defendant Robert E. Kirby, Regional Administrator of the Federal High-

way Administration ("FHWA")—which was modified, on August 18, 1980, by Kirby's superior, defendant Neil Goldschmidt, Secretary of Transportation—(a) authorizing the design and construction of a 1.4–mile segment of I–84 (the "I–84/I–86 Connector") in the eastern suburbs of Hartford; and (b) conditionally approving only design work, but not land acquisition or construction, for two longer segments of I–84 ("Section I" and "Section II") in Eastern Connecticut, to a point near the Connecticut–Rhode Island border. According to the plaintiffs, this decision—as modified by Secretary Goldschmidt, who added to the conditions of the approval of design work for Sections I and II—violated the requirements of the Federal–Aid Highway Act, 23 U.S.C. § 101 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the requirements of the Administrative Procedure Act ("APA") that agency actions not be "arbitrary and capricious," "abuse[s] of discretion," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The plaintiffs have moved for summary judgment on three of their five claims.

Three of the defendants in this action (Goldschmidt, Kirby and Donato J. Altobelli, the FHWA Division Administrator for Connecticut) are federal officials responsible for decisions relating to the proposal to extend I–84 eastward from East Hartford to Providence; the other defendant is Arthur B. Powers, Commissioner of the Connecticut Department of Transportation.[1] The defendants have filed affidavits and briefs in opposition to the plaintiffs' motion for partial summary judgment, and have cross–moved for summary judgment. The defendants argue that: (a) the plaintiffs' contentions with respect to the short I–84/I–86 Connector are without merit; and (b) with regard to the plans for Sections I and II in Eastern Connecticut, the plain-tiffs' claims are not ripe for adjudication, since no final decision authorizing land acquisition or construction has yet been made.

The court holds, for the reasons discussed at length below, that the federal defendants have indeed not yet taken any action as to Sections I and II which is sufficiently "final" to be reviewed by this court. Accordingly, the plaintiffs' arguments about the adequacy of the Environmental Impact Statements ("EIS's") prepared for these proposed segments of I–84 are not yet ripe for judicial determination. The court therefore denies the plaintiffs' motion for partial summary judgment insofar as it applies to Sections I and II, and grants the defendants' motions for summary judgment with respect to those two segments of the highway.

The questions concerning the I–84/I–86 Connector are in a somewhat different posture: although unquestionably ripe for judicial review (in that a final decision authorizing construction has been made), the controversy over this segment of I–84 has not yet been fully briefed by counsel. Thus, as requested by the federal defendants, the court defers ruling on the issues raised concerning the I–84/I–86 Connector pending the filing of additional papers according to a schedule set forth below.

## I. THE FACTUAL BACKGROUND

### A. *The Origin of the Proposal for the Extension of I–84*

Congress established a 41,000–mile National System of Defense and Interstate Highways (the "Interstate System") in 1958, in part "to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers ...." 23 U.S.C. § 103(e)(1). The original plans for the Interstate System included no link be-

---

1. On October 8, 1980, the court denied the motion of I–84 Yes, Inc., a corporation formed by businessmen, public officials and other residents of Eastern Connecticut to support plans for an interstate highway linking Hartford and Providence, to intervene as a party defendant. In that ruling, the court permitted I–84 Yes,

Inc. to participate as *amicus curiae*; as *amicus*, I–84 Yes, Inc. filed a brief and (after withdrawing at oral argument a motion for reconsideration of the court's ruling of October 8, 1980) presented oral argument on the pending motions.

tween Hartford and Providence; I–84 was to terminate at its junction with Interstate Route 291 in East Hartford, just across the Connecticut River from downtown Hartford.[2]

In 1968, Congress authorized the addition of 1,500 miles to the Interstate System.[3] Connecticut and Rhode Island jointly petitioned DOT that year for approval of a 65–mile extension of I–84, from East Hartford to Providence, in order to connect the principal metropolitan areas of the respective states.[4]

On December 13, 1968, DOT approved the addition of the East Hartford–Providence portion of I–84 to the Interstate System.[5] In 1970, NEPA became law; this federal statute required the preparation of EIS's for the proposed I–84 extension to Providence, with the exception of two segments in Connecticut which were already under construction when NEPA became effective, on January 1, 1970.[6] These segments, which have been completed and are now carrying traffic, are:[7]

(1) A. 7.1 mile portion of I–84, with termini at Spencer Street, Manchester (slightly to the east of the former terminus of I–84 in East Hartford) and Bolton Notch, Bolton.

(2) A 4.9 mile segment in Windham, in Eastern Connecticut. This portion of I–84, which skirts the city of Willimantic,

runs from the Coventry–Windham town line to Route 6 in Windham; it is known as the "Willimantic Bypass."

EIS's were required for the four proposed segments of the I–84 extension which were not under construction in 1970 (and on which no construction has taken place). As originally planned, these proposed segments were, from west to east:[8]

(1) *The I–84/I–86 Connector.* This segment includes widening 3.5 miles of existing highway and constructing 1.4 miles of new highway, in the Towns of East Hartford and Manchester. The I–84/I–86 Connector would run from Forbes Street, East Hartford to Spencer Street, Manchester (where the 7.1 mile Manchester–Bolton segment, already built, commences) and would link I–84 with Interstate Route 86 ("I–86"), which carries traffic in the direction of Boston.

(2) *Section I.* This 12.6 mile segment would link Bolton (where the 7.1 mile Manchester–Bolton segment, now in use, terminates) with Windham (where the Willimantic Bypass, also already in use, begins).

(3) *Section II.* This segment would run from Route 6 in Windham, the terminus of the existing Willimantic Bypass, to the Connecticut–Rhode Island border at Killingly, Connecticut. It would cover a distance of 17.8 miles.

**2.** *See* Complaint ¶ 24 (admitted by the defendants in their respective Answers). Hartford and Providence are connected by United States Route 6, which is not a limited–access expressway, as an interstate highway would be; the proposal to extend I–84 to Providence apparently grew out of a plan to upgrade Route 6. *See id.* ¶¶ 20 (admitted by the defendants in their respective Answers), 24.

**3.** Complaint ¶ 23 (admitted by the defendants in their respective Answers). *See* Federal–Aid Highways Act of 1968, § 14(b)(3), *codified in* 23 U.S.C. § 103 (e)(3).

**4.** Complaint ¶ 24 (admitted by the defendants in their Answers); Plaintiffs' First Request for Admissions ¶ 5(a) (admitted by the defendants). According to defendant Powers, sections of the proposed route in Manchester and the vicinity of Willimantic, Connecticut, were already under construction as limited–access express highways in the 1960s; they were in-

corporated in the plans for the extension of I–84 to Providence. *See* Affidavit of Arthur B. Powers, sworn to September 25, 1980 ("Powers Affidavit") ¶¶ 2, 3.

**5.** Complaint ¶ 24 (admitted by the defendants in their Answers). Although his answer admits that the date of DOT approval was December 13, 1968, defendant Powers has also stated that such approval was given on March 4, 1969. *Compare* Answer of Defendant Powers ¶ 24 *with* Powers Affidavit ¶ 2.

**6.** *See* 42 U.S.C. § 4332; Powers Affidavit ¶ 3.

**7.** *See* Complaint ¶¶ 25(b), 25(d); Answer of Federal Defendants ¶ 25; Powers Affidavit ¶ 3(c). These two segments are the ones to which reference is made in note 4, *supra.*

**8.** Complaint ¶¶ 25(a), 25(c), 25(e), 25(f); Answer of Federal Defendants ¶ 25.

(4) *The Rhode Island Segment.* This 19.3–mile long segment would run from the state line to Interstate Route 295 in Providence. According to the plaintiffs, the route originally proposed for the Rhode Island Segment was almost entirely within the Scituate Reservoir, the primary source of high quality drinking water for the majority of Rhode Islanders.[9]

Plans for the four proposed segments of I–84 between East Hartford and Providence have not advanced through the administrative process at a uniform pace. The I–84/I–86 Connector was the subject of a draft EIS prepared in 1973, when it was contemplated that I–86 would be extended southwest of the I–84/I–86 interchange, from Manchester to Glastonbury. After those plans for I–86 were rescinded, a new draft EIS for the I–84/I–86 Connector was prepared in 1976. Hearings on the revised draft were held in Manchester and East Hartford in March 1977, and in 1978 the final EIS for the I–84/I–86 Connector was submitted, first to the FHWA Region 1 Office for its approval, and then to the FHWA's Washington headquarters for its approval, known as "prior concurrence," as required by 23 C.F.R. § 771.14(c).[10]

Draft EIS's were prepared for Sections I and II in Eastern Connecticut in 1972; these were the subjects of hearings held in 1972 and 1975 in the towns of Coventry, Brooklyn, Killingly, Scotland, Canterbury, Hampton, Plainfield, Windham and Bolton.

The Final EIS for Section I was submitted to the FHWA regional office in December 1975; the corresponding document for Section II was submitted in January 1976. In 1978, these EIS's were sent to Washington for FHWA "prior concurrence." [11]

The Rhode Island Segment was the subject of a 1972 draft EIS, on which hearings were held the following year. The complaint does not allege that the FHWA Region 1 office received the final EIS for this portion of I–84, although the final EIS was evidently submitted to Washington for "prior concurrence" in 1978.[12]

B. *The Conditional Approval by DOT of Certain Plans for Portions of the I–84 Extension*

Pursuant to 23 C.F.R. § 771.14(c), and apparently on behalf of FHWA's Washington headquarters, Acting Assistant Secretary of Transportation Charles Swinburn issued a memorandum on October 12, 1979, in response to the requests for "prior concurrence" in the plans for the four segments of I–84. In this memorandum,[13] Swinburn noted that action on the I–84 proposal had been deferred in June 1979, pending efforts to resolve certain qualms which the Environmental Protection Agency ("EPA") had about the plans. He observed that, as a result of FHWA–EPA consultation,

> the air quality issues concerning the Connecticut portion of I–84 have been satis-

9. Complaint ¶ 15. The plaintiffs allege that the construction of an interstate highway through this reservoir would increase the "runoff" of salt there, add to the risk that hazardous materials would spill in the watershed area, encourage "detrimental secondary [economic] development" of the area, and interfere with the water treatment plant located at the Scituate Reservoir site. *Id.*

10. *See* Complaint ¶ 29 and Table 1 (admitted in relevant part in the Answers); *Powers Affidavit* ¶¶ 3(a), 4. The procedure for "processing" a final EIS is spelled out in 23 C.F.R. § 771.14. That provision calls for initial review of a final EIS by the regional FHWA administrator, 23 C.F.R. § 771.14(b); *if he is satisfied with it,* the EIS is submitted to FHWA's Washington headquarters for the "prior concurrence" of that office. 23 C.F.R. § 771.14(c). After such "pri-

or concurrence," the EIS is formally approved by the regional FHWA administrator and is available to the public and EPA, 23 C.F.R. § 771.14(d), and remains subject to reevaluation by the Connecticut Department of Transportation, as the relevant "highway agency," *see* 23 C.F.R. § 771.3(f), and FHWA in light of any changed circumstances. 23 C.F.R. § 771.-14(i).

11. *See* Complaint ' 29 and Table 1 (admitted in relevant part in the defendants' Answers); *Powers Affidavit* ' 4.

12. *See* Complaint ' 29 and Table 1 (admitted in relevant part in the defendants' Answers).

13. Complaint, Exhibit D, Tab U.

factorily resolved. However, questions about the potential impacts of I–84 on the water quality of the Scituate Reservoir in Rhode Island have not been resolved, notwithstanding the efforts that have been made. In this connection, EPA continues to believe that further study of alternative alignments outside the watershed of the Scituate Reservoir should be undertaken in conjunction with studies of design measures to minimize the impact of an alignment through the watershed. . . .

Accordingly, Swinburn took the following actions:

(a) He unconditionally concurred in the proposal to build the I–84/I–86 Connector in the Greater Hartford area, thereby endorsing the commencement of construction on that short stretch of I–84;

(b) He conditionally concurred in the EIS's for Sections I and II, to the extent that he authorized design work to proceed for these segments of the highway as far east as the proposed intersection of I–84 and State Route 52 in Killingly, Connecticut, approximately two miles west of the Rhode Island border. Swinburn proscribed any purchase of rights–of–way for, or the commencement of construction of, these segments. His limited authorization of design work was expressly conditioned upon either (1) the final approval by DOT of an acceptable EIS for the Rhode Island segment, after the filing of such an EIS with the EPA and the passage of a 30–day waiting period for EPA action, or (2) the supplementation of the final EIS's for the Connecticut portion of I–84 with an analysis of the impacts on Rhode Island's environment of the construction of I–84 only as far as

State Route 52 in Connecticut. Unless and until one of those conditions were met, Connecticut officials could not take additional steps toward the construction of I–84.

(c) He declined to give "prior concurrence" in the case of the Rhode Island segment.

In support of his decision, which permitted limited design work on Sections I and II by the Connecticut Department of Transportation pending resolution of the environmental issues concerning the Rhode Island segment, Swinburn wrote:

I believe that the conditional approval satisfies all environmental[,] statutory, regulatory, and policy requirements in the peculiar circumstances of this case. It will permit the [Connecticut officials] to continue with design work for a section of the highway which will not, in and of itself, have serious adverse environmental impact. At the same time, it assures that before any possible commitments are made to construct the Connecticut portion of the project, the possible effect of the Connecticut portion on Rhode Island will be analyzed.

Pursuant to 23 C.F.R. § 771.14(d), on November 19, 1979, defendant Kirby, the regional administrator for FHWA Region 1, formally approved the final EIS for the I–84/I–86 Connector without conditions, and gave his conditional approval of the EIS's for Sections I and II (up to State Route 52). This decision was made in accordance with Swinburn's October 12, 1979 memorandum.[14] In their complaint, the plaintiffs state that "[i]t is this final action of Defendant Kirby that Plaintiffs challenge in this action."[15]

---

**14.** Complaint ¶ 31 (admitted in relevant part by the defendants in their Answers). Under the applicable regulation, Kirby's approval in effect implemented the decision made in Washington by Swinburn. As outlined in note 10 *supra*, 23 C.F.R. § 777.14(d) provides that upon "final concurrence" by "the FHWA Washington Headquarters Office," that office—here, in the person of Swinburn—"will notify the Regional Federal Highway Administrator [*i. e.*, for Region I, Kirby] when he may release the final EIS to the public and EPA, at which time the

Regional Federal Highway Administrator will adopt and sign the final EIS" and distribute it to EPA's Washington and regional offices, "[s]tate and area–wide clearinghouse[s]" and "[a]gencies, organizations and individuals who made substantive comments on the draft EIS and who requested a copy of the final EIS."

**15.** Complaint ⁋ 31. The defendants do not concede that Kirby's action was "final," and indeed argue strenuously to the contrary in support of their motions for summary judgment.

The conditional approval by FHWA of the proposed Eastern Connecticut segments of I–84 generated controversy within the federal government. On December 13, 1979, EPA referred its continuing dispute with FHWA over the adequacy of the EIS's to the Council on Environmental Quality ("CEQ"),[16] as provided by 40 C.F.R. Part 1504.[17] The EPA's concerns, as expressed in its submission to CEQ, were limited to the effects of building Sections I and II in the Scituate Reservoir area; in the letter referring the dispute to the CEQ,[18] EPA Administrator Douglas M. Costle argued that plans for the two Eastern Connecticut segments of I–84 should not be allowed to advance, even to the limited extent permitted by the FHWA's conditional "prior concurrence," because:[19]

> [p]ermitting these two segments to go forward commits I–84 to a location in Connecticut which:
>
> 1. eliminates further consideration of other corridors in Connecticut (some of which have not been studied in an EIS) which would tend to avoid the [Scituate Reservoir] watershed;
>
> 2. unduly biases against the selection of alternative non–watershed corridors in Rhode Island; and

> 3. creates a situation of maximum danger to the Scituate Reservoir if it is subsequently decided not to construct I–84 in Rhode Island.

Presumably because the construction of the short I–84/I–86 Connector in Greater Hartford—far from the Scituate Reservoir—would have no significant impact on the environmental quality of that Rhode Island watershed area, the EPA Administrator stated in his letter of December 13, 1979 that his agency had no objection to the construction of the I–84/I–86 Connector.[20] While Costle did not object to FHWA's decision to approve unconditionally the construction of the I–84/I–86 Connector, he asked CEQ, in his letter, to recommend to Secretary of Transportation Goldschmidt that DOT rescind the "prior concurrence" granted conditionally by FHWA with respect to Sections I and II.[21]

On April 30, 1980, Gus Speth, chairman of CEQ, informed Goldschmidt that, in CEQ's view, the conditional approval of design work for Sections I and II violated NEPA, because it "seriously limits and prejudices the choice of alternatives in the new Rhode Island EIS and the possible supplemental Connecticut EIS and commits federal resources prematurely."[22] Goldschmidt responded to CEQ's concerns in an August 18,

---

**16.** CEQ was established in the Executive Office of the President by NEPA, Pub. L. 91–190, § 202, *codified in* 42 U.S.C. § 4342. Its duties include making studies of environmental issues and advising the President on proposed federal programs affecting the environment. *See* 42 U.S.C. § 4344. "The CEQ's role is to advise the executive branch on the merits of proceeding with a project; it is not entrusted with decision making." *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 554 (9th Cir. 1977) (per curiam).

**17.** The relevant regulations establish "procedures for referring to [CEQ] Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects." 40 C.F.R. § 1504.1(a). The drafters of these regulations added hopefully that 40 C.F.R. Part 1504 "provides means for early resolution of such disagreements." *Id.* The history of this case suggests that this is not always so.

**18.** Letter of EPA Administrator Douglas M. Costle to Neil Goldschmidt, Dec. 13, 1979, Secretary of Transportation, Complaint, Exhibit C.

**19.** *Id.* at 2. The Department of the Interior informed DOT of similar concerns, particularly about "the effects [which] construction of Sections I and II and the Rhode Island segment will have on fish and wildlife." Letter of Assistant Secretary Larry E. Meierotto, Department of the Interior, to Neil Goldschmidt, Secretary of Transportation, Dec. 28, 1979, Complaint, Exhibit E, at 1.

**20.** *See* letter of EPA Administrator Douglas M. Costle to Neil Goldschmidt, Secretary of Transportation, Dec. 13, 1979, Complaint, Exhibit C, at 4.

**21.** *See id.* at 7.

**22.** Letter of Gus Speth, CEQ Chairman, to Neil Goldschmidt, Secretary of Transportation, April 30, 1980, Exhibit T to Plaintiffs' Motion for Partial Summary Judgment, p. 1.

1980 letter to Speth,[23] in which he explained his decision to modify substantially FHWA's conditional approval of Sections I and II. Goldschmidt stated that he "recognize[d] and share[d]" the concerns of EPA and CEQ "that actions not be taken which would jeopardize the drinking water supply for the Providence metropolitan area" and suggested that his decision modifying the FHWA determination would be sufficient to accommodate those concerns.

In his letter to Speth, Goldschmidt announced that [24]

[i]n recognition of the concerns for the protection of the reservoir, I am directing FHWA to inform the Rhode Island Department of Transportation that we will consider approving a route only through the northern or southern corridor [of Rhode Island]. I am directing FHWA and Rhode Island to eliminate from further consideration the route through the Scituate Reservoir, although they may continue to study it for the purpose of developing a comprehensive environmental impact statement for the Rhode Island section.

Goldschmidt continued: [25]

Since the protection of the Scituate Reservoir water supply is assured by this action, I am authorizing FHWA to allow design work to proceed along the location discussed in the environmental impact statements for sections [I and II] in Connecticut to Route 52. This will allow the potential saving of significant time and money, without causing any adverse environmental impacts, and without committing this Department to any future action.

At the same time, we will inform the State of Connecticut that *we will not approve the acquisition of land or any construction on its portions of I–84 (except, of course, for the I–84/I–86 connector) unless either:*

(a) *a decision is made to proceed with construction of I–84 in Rhode Island following preparation and approval of an environmental impact statement;* or

(b) *we are directed by Congress to do so.*

In making this decision, I am cognizant that in 1965 [sic] Congress added the entire Hartford–Providence section to the Interstate System. Thus, *I am modifying the conditions in our October 12, 1979, conditional approval* of the environmental impact statements for the Connecticut portions of I–84 *to assure that, if the Rhode Island section is not approved, further construction of I–84 in Connecticut will not occur without a specific congressional direction to do so.*

As a result of this modification of FHWA's conditional approval of EIS's for Sections I and II as far east as State Route 52, DOT has permitted Connecticut officials to undertake design work—but nothing more—with respect to those sections; the route of I–84 through Rhode Island, if it is ever built in that state, will not cut through the Scituate Reservoir; [26] and Sections I and II will not proceed beyond the design state unless and until a final EIS for a Rhode Island segment is approved, or Congress mandates that land be acquired or construction be commenced in Connecticut.[27]

**23.** Brief in Support of Federal Defendants' Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Federal Defendants' Brief"), Exhibit A.

**24.** *Id.* at 1.

**25.** *Id.* at 1–2 (emphasis added).

**26.** The Secretary's decision that I–84 not be built through the Scituate Reservoir followed CEQ's recommendation on this issue. *See* Exhibit T to Plaintiffs' Motion for Partial Summary Judgment, pp. 2–3.

**27.** After Secretary Goldschmidt's decision, the EPA Administrator reaffirmed his "finding that the decision to proceed with design of [Sections I and II of] I–84 is unsatisfactory from the standpoint of public health and environmental quality." Letter of EPA Administrator Douglas M. Costle to Neil Goldschmidt, Secretary of Transportation, September 24, 1980, Attachment 2 to Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Injunctive Relief and Plaintiffs' Memorandum in Opposition to Defendants' Cross–Motion for Summary Judgment ("Plaintiffs' Reply Brief"), p. 3.

## II. THE CONTENTIONS OF THE PARTIES

The complaint contains five counts. In Count I, the plaintiffs allege that the defendants illegally held separate public hearings on the individual segments of the proposed East Hartford–Providence highway; according to the plaintiffs, the requirement of the Federal–Aid Highways Act that public hearings be held, see 23 U.S.C. § 128(a), means that all hearings on the proposed extension of I–84 must cover the entire proposed route.[28] In Count II, the plaintiffs charge that the federal defendants violated NEPA and regulations promulgated under that statute by prematurely dismissing, without sufficiently detailed environmental analysis, alternatives to an interstate highway; in that count the plaintiffs also allege that the defendants violated NEPA by prematurely approving a specific location in Connecticut for I–84 without adequately assessing the likely impact of such a route on the Scituate Reservoir in Rhode Island.[29] Count III arises under NEPA and the APA; in this count, the plaintiffs allege that the federal defendants abused their discretion in rejecting all alternatives to an interstate highway, purportedly on the ground that such alternatives would not meet the standards for an interstate highway.[30] In Count IV, the plaintiffs claim that the plans for I–84 between East Hartford and State Route 52 in Killingly violate the provision of the Federal–Aid Highways Act, 23 U.S.C. § 103(e)(1), which establishes criteria for appropriate termini for interstate highways.[31] Finally, Count V charges the federal defendants with failing to adopt feasible and prudent alternatives to the tentatively approved location of I–84 in Connecticut which would minimize the harm to public parklands, state forests and historic sites in the vicinity of the proposed highway; the plaintiffs contend that this violates 23 U.S.C. § 138 and section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f).[32]

The plaintiffs' motion for summary judgment on the first three counts of their complaint seeks an injunction preventing the defendants from proceeding with the design, acquisition of rights of way for, or construction of, any portion of I–84 east of Hartford; in addition, they request a declaratory judgment adjudicating all such activity to be unlawful. In opposition to the plaintiffs' motion, the defendants have argued that they have taken no unlawful actions with respect to the proposed extension of I–84 (either with respect to the I–84/I–86 Connector or Sections I and II). The defendants have also moved for summary judgment, dismissing the plaintiffs' complaint insofar as it pertains to Sections I and II on the ground that the issues which the plaintiffs have raised concerning those proposed portions of I–84 are not yet ripe for adjudication.

The defendants' summary judgment motion raises a threshold question: whether

According to an affidavit sworn to by the FHWA's Division Administrator for Rhode Island, a draft EIS for a non–Scituate Reservoir route for the Rhode Island Segment, in accordance with Secretary Goldschmidt's August 18, 1980 decision, is expected to be completed in December 1982, and a final EIS is expected to be approved in September 1983. Affidavit of Gordon G. Hoxie, sworn to September 25, 1980, ¶¶ 3(b), 3(d).

Any ambiguities concerning Secretary Goldschmidt's decision of August 18, 1980 were clarified in his October 17, 1980 letter to CEQ Chairman Gus Speth, which is attached to the Reply Brief of Federal Defendants as Exhibit A. That letter states clearly that "I am informing the State of Rhode Island that its study of the alternatives outside the reservoir should not include further consideration or study of an alternative through the reservoir." In his Octo-

ber 17 letter, Secretary Goldschmidt makes clear that "if a decision is made not to build I–84 in Rhode Island and consideration continues with respect to construction of the Connecticut portion as the result of Congressional action, we would have a supplemental environmental impact statement prepared with respect to the potential impact on Rhode Island of completion of the Connecticut portion of I–84."

28. See Complaint ¶¶ 50–55.

29. See id. ¶¶ 56–60.

30. See id. ¶¶ 61–65.

31. See id. ¶¶ 66–68.

32. See id. ¶¶ 69–71.

there has been any sufficiently "final" agency action which would enable the court to undertake judicial review of DOT's conditional approval of design work for Sections I and II. The court must turn first to that important preliminary issue.

### III. SECTIONS I AND II: THE QUESTION OF RIPENESS

■ Where, as here, injunctive relief and a declaratory judgment are sought with regard to an administrative determination, the "courts traditionally have been reluctant" to grant such relief unless there is a "controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In *Abbott Laboratories*, the Court observed that the "basic rationale" for the ripeness doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–49, 87 S.Ct. at 1515.

■ Under the ripeness doctrine, an agency must have taken "final" action before judicial review is appropriate; this requirement of finality is codified in section 10(c) of the APA, 5 U.S.C. § 704, and has been applied to actions challenging the adequacy of an EIS under section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). *See Envi-*

*ronmental Defense Fund, Inc. v. Johnson*, 629 F.2d 239, 241 (2d Cir. 1980); *Sierra Club v. United States Army Corps of Engineers*, 481 F.Supp. 397, 399 (S.D.N.Y.1979); *Association of Community Organizations for Reform Now v. Southeastern Pennsylvania Transportation Authority*, 462 F.Supp. 879, 883–85 (E.D.Pa.1978); *aff'd without opinion*, 605 F.2d 1194 (3d Cir. 1979); *Natural Resources Defense Council, Inc. v. Andrus*, 448 F.Supp. 802, 806 (D.D.C.1978); *Sierra Club v. Morton*, 421 F.Supp. 638, 646 (D.D. C.1974).

In *Sierra Club v. United States Army Corps of Engineers, supra*, 481 F.Supp. at 399, the court emphasized the importance of the finality requirement in the context of a challenge to an EIS upon which an agency is to act:

> The adequacy of an EIS can only be evaluated in light of specific proposals. For example, an EIS must discuss all relevant alternatives to proposed agency action. Whether the content and scope of those discussions is adequate necessarily depends on the precise nature of the agency's final recommendation.

In this case, "the precise nature of the agency's final recommendation" with respect to Sections I and II is not yet known, and will probably not be determined until late 1983.[33] Indeed, in light of Secretary Goldschmidt's decision of August 18, 1980—which significantly modified the conditional FHWA decision from which the plaintiffs originally sought relief by filing this lawsuit[34]—the court has no way of predicting whether DOT will ultimately authorize the

---

33. *See* note 27, *supra.*

34. The premature nature of this lawsuit, which was filed on January 28, 1980, insofar as it concerns Sections I and II, is underscored by Secretary Goldschmidt's modification of the FHWA decision of October 12, 1979. For example, the plaintiffs contend that the choice of a route for I-84 in Eastern Connecticut (*i. e.*, Sections I and II) would inevitably foreclose alternatives to constructing the Rhode Island Segment through the Scituate Reservoir. *See* Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Injunctive Relief, p. 13. However, as a result of Secretary Goldschmidt's decision (which was made after

the filing both of this action and the plaintiffs' motion for partial summary judgment) DOT will not approve any route for I-84 which cuts through the Scituate Reservoir, and will not approve the acquisition of land for, or construction of, Sections I and II in Eastern Connecticut unless an alternate Rhode Island route is approved. The application of the ripeness doctrine is particularly appropriate against this factual background, for that doctrine is designed, in part, to avoid "advisory opinions on issues not fully framed or potentially moot." *Sierra Club v. United States Army Corps of Engineers*, 481 F.Supp. 397, 398 (S.D.N.Y. 1979).

acquisition of land for Sections I and II and permit construction of those segments of I–84, or whether DOT will terminate all plans to extend I–84 in Eastern Connecticut and into Rhode Island. Secretary Gold-schmidt's conditional decision expressly links the fate of Sections I and II, beyond the design stage, to the approval of a plan for the Rhode Island Segment. No EIS for such a plan has yet been written and it is not expected that a draft EIS will be ready for comment until December 1982; approval of a final EIS for the Rhode Island Segment will probably take place no sooner than September 1983.[35] In view of this, approval of a final EIS for Sections I and II clearly is not a signal that construction or land

acquisition is about to go forward; in fact, it is no more certain now that such steps will ever be taken than it was before Secretary Goldschmidt's conditional approval of the EIS's for Sections I and II.[36]

The only decision made by DOT with respect to Sections I and II is to permit federally–financed design work to begin. The plaintiffs, stressing the commitment of federal funds to this work, argue that DOT's decision constitutes reviewable "final" agency action. The court disagrees. Although the plaintiffs are correct in pointing out that the approval of design work necessarily entails the expenditure of some federal money,[37] that fact is not dispositive

---

**35.** See note 27, supra.

**36.** This circumstance, which may be unusual, is in part the result of the somewhat fragmented decision–making process employed by FHWA and DOT. See note 41, infra. The federal defendants' resort to piecemeal EIS's which are only conditionally approved and are not intended or designed to be the basis for a final decision until they are supplemented and augmented by other EIS's leaves the status of the I–84 project in limbo while creating an administrative record which is hardly a model of clarity. While the use of such procedures may be frustrating to interested parties (such as the plaintiffs here), it remains inappropriate for a federal court to engage in substantive review of the adequacy of an EIS until it becomes the basis for "final" agency action. See Sierra Club v. United States Army Corps of Engineers, 481 F.Supp. 397, 399 (S.D.N.Y.1979); Natural Resources Defense Council, Inc. v. Andrus, 448 F.Supp. 802, 806 (D.D.C.1978). It is noteworthy that the plaintiffs' counsel conceded at oral argument that it remains possible that Sections I and II will not be built, although he expressed the view that it was probable that construction would ultimately take place. See Transcript of Oral Argument, Oct. 28, 1980 ("Tr."), pp. 21–22.

**37.** In an affidavit, defendant Altobelli indicates that the design work in question will proceed in two stages. The first will consist of studies of preliminary design layout, the dimensions of the project, the grade of the road, drainage problems and similar matters; it is expected to take approximately 18 months to complete, at an estimated cost (to DOT) of between $6 million and $10 million. If, after a public hearing, DOT approves a second stage of design work, that phase (which will consist of the preparation of construction plans and plans for acquiring rights–of–way) will proceed for approxi-

mately 18 to 24 months, at an estimated additional cost of $11 million to $15 million. In the event that the Rhode Island Segment is ultimately not approved or that DOT, for other reasons, chooses to terminate design work for Sections I and II in Eastern Connecticut, DOT may cut off federal funding at any time. See Affidavit of Donato J. Altobelli, sworn to September 26, 1980, ¶¶ 9–25 ("Altobelli Affidavit"). The plaintiffs have suggested that the commitment of such financial resources to design work would provide "administrative momentum" in favor of unconditional approval of the proposed extension of I–84, and would have a "coercive effect on the decision–making process." See Tr. 15–17. In response, the defendants have pointed out that, as a result of Secretary Goldschmidt's August 18, 1980 decision, they are committed to undertake further review of the proposal upon submission by Rhode Island Authorities of an EIS for the Rhode Island Segment before approving land acquisition or construction of Sections I and II; accordingly, DOT "has unequivocally put brakes on" any "administrative momentum." See Tr. 34. The defendants have also assured the court that they are prepared to sacrifice millions of dollars—as DOT assertedly has done in the past—spent for design work if, after consideration of the new Rhode Island EIS and supplemental submissions regarding the Connecticut segments, it appears that the extension of I–84 did not merit DOT's approval. See Tr. 36–38, 45–46. In conditionally approving design work for Sections I and II, DOT is "gambling" as much as $25 million (Tr. 37; see Altobelli Affidavit ¶ 16) that I–84 will ultimately be approved—without in any sense committing itself to granting such approval—in order to realize cost savings estimated at $54 to $70 million; if the highway extension is never constructed, DOT will suffer the loss of the smaller, although significant, amount of money expended on de-

of the crucial question in determining the finality of DOT's decision—namely, whether the conditional approval of design work is an action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Here, as in *Environmental Defense Fund, Inc. v. Johnson, supra,* the plaintiffs have not even attempted to demonstrate that the mere execution of design studies—as opposed to land acquisition and construction—will have any effect on the environment.[38] *See Environmental Defense Fund, Inc. v. Johnson,* 476 F.Supp. 126, 129 n.3 (S.D.N.Y. 1979), *aff'd,* 629 F.2d 239 (2d Cir. 1980). Rather, as in that case, the plaintiffs contend that there is necessarily so close a connection between the authorization of design work and the (as yet unauthorized) actual construction that the latter is now inevitable; this allegedly renders the decision to fund design work a "final" action subject to judicial review.[39]

In *Environmental Defense Fund, Inc. v. Johnson,* the plaintiffs contended that an $8 million study by the United States Army Corps of Engineers for a planned $4.6 billion water supply project constituted a reviewable "final" action, principally on the ground that the funding of such a study was an irreversible step toward the actual construction of the challenged project. In the district court, Judge Gagliardi rejected this argument, writing:

> A decision to seek funding for the Phase I Study no doubt represents a determination that a large commitment of time, money, and resources should be made in order to explore a solution to the [New York metropolitan] region's water supply problem. Such activity, however, is not equivalent to final agency action since the Corps will undoubtedly submit another report after the proposed study is completed with a recommendation either to construct or not to construct the [project]. Until that time, the defendants continue to study whether to take final action, and thus, the matter is not yet ripe for judicial review.

*Environmental Defense Fund, Inc. v. Johnson, supra,* 476 F.Supp. at 129.[40]

sign work for Sections I and II. While the wisdom of this "gamble," as a matter of administrative practice, may be debatable, the court cannot concern itself with the wisdom of DOT's decision to proceed as it has, in the absence of any "final" action which is subject to judicial review. *See* note 41, *infra.*

**38.** In fact, as CEQ has observed, the design of I–84 "would not directly cause immediate physical damage to the environment." Letter of Gus Speth, Chairman of CEQ, to Neil Goldschmidt, Secretary of Transportation, April 30, 1980, Exhibit T to Plaintiffs' Motion for Partial Summary Judgment, p. 1. At oral argument, counsel for the plaintiffs conceded this point. *See* Tr. 18–19.

**39.** *See* Plaintiffs' Reply Brief, pp. 3–5. The plaintiffs also assert that "[t]he question of the adequacy of [the Section I and Section II] EIS's . . . is ripe for review" because CEQ has indicated that it is not satisfied with those EIS's. *Id.* at 5. The plaintiffs have, however, called to the court's attention no authority supporting the notion that a dispute between a presidential advisory council (*see* note 16, *supra*) and an executive department constitutes a justiciable case or controversy under article III of the United States Constitution. Nor is the court aware of any support for the proposition that even if such a dispute gave rise to a claim by CEQ against DOT or DOT executives, that claim could be asserted on CEQ's behalf by the private corporations and associations which brought this action.

**40.** In that case, the Corps of Engineers determined not to prepare a final EIS until after the completion of the "Phase I Study"; that study was authorized on the basis of a final report by the Corps and a draft EIS. *See Environmental Defense Fund, Inc. v. Johnson, supra,* 476 F.Supp. at 127–28. Here, FHWA regulations apparently required the submission of a final EIS prior to authorization of design work. *See* 23 C.F.R. § 771.5(e). This administrative policy may represent an overly cautious approach to NEPA. *Cf. Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976) ("the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action" requiring a final EIS under 42 U.S.C. § 4332(2)(C)); *Mobile Oil Corp. v. Federal Trade Commission,* 562 F.2d 170, 173 (2d Cir. 1977) (EIS need not be filed until " 'irreversible and irretrievable commitments of resources' to action affecting the environment" are made [quoting 42 U.S.C. § 4332(2)(C)(v)]). However, neither the wisdom of the FHWA regulations nor the appropriateness of their application here are questions for this court, which cannot

The Court of Appeals for the Second Circuit, affirming the district court's decision, endorsed Judge Gagliardi's reasoning:

Even if funds are made available, the proposed Phase I Study may reaffirm [the proposed water supply project], reform it, or even recommend that it not be constructed. We are here asked to intervene in an administrative process which at this point has created no rights or obligations and involves no legal consequences. As Judge Gagliardi observed, "the possibility still exists that the [project] either may be abandoned or significantly altered after the Phase I study is completed." 476 F.Supp. at 130.

We conclude that no final agency action has been taken, that the issues are not ripe for adjudication and that our intervention would not only be a waste of judicial resources but an untoward interference in the administrative process.

*Environmental Defense Fund, Inc. v. Johnson, supra,* at 241.

In this case, as in *Environmental Defense Fund, Inc. v. Johnson,* the mere authorization of design work does not itself cause the agency to commit itself irrevocably to take steps (such as the acquisition of land or the commencement of construction) which would "significantly [affect] the quality of the human environment." 42 U.S.C. § 4332(2)(C).[41] *Cf. Sierra Club v. United States Army Corps of Engineers, supra*

(holding that plaintiffs' attack on the adequacy of an EIS for landfill plans for a superhighway in Manhattan—which had been approved by the Corps of Engineers— was ·not ripe for judicial review, since the Corps had not yet made a final decision to issue the landfill permits necessary for construction of the highway). Indeed, on the facts of this case, the contrary is true. As noted previously, in approving design work for Sections I and II, DOT expressly reserved decision on further work which would have a direct effect on the environment, and explicitly conditioned approval of such work on the preparation and approval of a final EIS for the Rhode Island Segment of I–84. This is not a case where the decision to fund design work makes inevitable any irreversible or irretrievable administration action which would significantly affect the environment. *Cf. Mobil Oil Corp. v. Federal Trade Commission,* 562 F.2d 170, 173 (2d Cir. 1979). The court must therefore conclude that DOT has yet to take any "final" action subject to judicial review with respect to Sections I and II.

■ Accordingly, the court finds it inappropriate to consider the merits of the EIS's for Sections I and II and grants the defendants' motions for summary judgment to the extent that the plaintiffs' claims challenging those EIS's are dismissed as not ripe for adjudication.[42] Such dismissal is without

---

second–guess administrative procedures so long as they are not arbitrary, capricious, or contrary to law. *See generally Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524–25, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

**41.** *See also Committee Against Railroad Relocation v. Adams,* 471 F.Supp. 142, 145 (E.D. Ark.1979) (draft EIS not reviewable under NEPA because "[m]any procedures still remain to be completed prior to any Federal authorization to proceed with either land acquisition or construction activities"). Although the court in that case indicated that a decision of the FHWA would be reviewable upon the approval of a final EIS, *see id.,* it does not follow that in every case judicial review is appropriate upon the filing of a final EIS. On the facts of this case—particularly DOT's conditional and tentative approval of the final EIS's for Sections I

and II, deferring decision on action affecting the environment until further steps are taken with respect to the Rhode Island Segment—approval of the final EIS's for the Eastern Connecticut segments of I–84 is not enough to render those EIS's reviewable by this court. Although the administrative procedures which put the case in its present posture are subject to criticism, *see* note 36, *supra,* the court is mindful of the Supreme Court's admonition against federal courts "engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

**42.** This decision necessarily requires the court to deny as moot the plaintiffs' motion for partial summary judgment insofar as it concerns

prejudice to the plaintiffs' right to challenge any "final" agency action to proceed with those segments of I–84 (such as a decision authorizing the acquisition of land or the construction of Sections I and II) which DOT may ultimately take. The court's ruling on the issue of ripeness prevents inappropriate judicial interference with an ongoing administrative decision–making process, without depriving the plaintiffs of a judicial forum to challenge any subsequent administrative determination which—unlike the only decision made by DOT so far—would necessarily make the construction of the challenged extension of I–84 in Eastern Connecticut inevitable or irreversible. *See generally Committee Against Railroad Relocation v. Adams,* 471 F.Supp. 142, 146 n.1 (E.D.Ark.1979); *Natural Resources Defense Council, Inc. v. Andrus, supra,* 448 F.Supp. at 806; *Potomac River Association, Inc. v. Lundberg Maryland Seamanship School, Inc.,* 402 F.Supp. 344, 352–53 (D.Md.1975).

### IV. THE I–84/I–86 CONNECTOR

Although no "final" agency action has been taken with regard to the two Eastern Connecticut segments of the proposed I–84 extension, the construction of the planned I–84/I–86 Connector in East Hartford and Manchester has been given final approval by Secretary Goldschmidt. That decision concededly [43] is ripe for judicial review.

Because of its metropolitan location and its function as a link between two existing interstate highways, the I–84/I–86 Connector appears to be a project which may be considered separately from the other seg-

ments of I–84 which are proposed for Eastern Connecticut and Rhode Island. The federal defendants stress these factors in their argument that the I–84/I–86 Connector should be viewed as an independent segment of highway with a utility apart from that of Sections I and II and the Rhode Island Segment, and should be permitted to proceed to construction on the basis of the separate EIS prepared for it.[44] The federal defendants have advanced in skeletal form the argument that the final EIS for this segment of I–84 is adequate, but have not fully briefed that issue; they have requested that the court defer ruling on this question pending the submission of additional briefs.[45]

The court finds that deferring a decision on the question whether approval of construction of the I–84/I–86 Connector should go forward, in order to allow for detailed briefing, would serve the interests of justice and would prejudice no party to these proceedings. Deferring a decision would permit the federal defendants to address the merits of the plaintiffs' claims concerning the I–84/I–86 Connector and allow the plaintiffs to reassess those claims in light of the court's decision that the adequacy of the EIS's for Sections I and II is not a question ripe for adjudication. Moreover, since the plaintiffs have agreed not to challenge the authorization of design work for the I–84/I–86 Connector,[46] a brief deferral will neither delay the defendants' plans nor harm the plaintiffs' interests. Accordingly, the court orders that the federal defendants file a brief on the plaintiffs' claims with respect to the I–84/I–86 Connector no later than December 3, 1980,[47] and that the plain-

Sections I and II. Regarding the premature nature of the lawsuit, *see* note 34, *supra,* and the accompanying text.

**43.** *See* Federal Defendants' Brief, p. 26.

**44.** *Id.* at 27–30. The court declines the invitation of the federal defendants separately to rule on the "independent utility" issue at this time. *See* Reply Brief of Federal Defendants, p. 10. The briefs to be submitted pursuant to this order should address the merits of the EIS for the I–84/I–86 Connector on the assumption that there was cause to treat that segment separately from the other segments of I–84. The court will address all questions relating to

the I–84/I–86 Connector (including the "independent utility" issue) together, in one supplemental opinion.

**45.** *See* Federal Defendants' Brief pp. 26–27, 29 n.23.

**46.** *See* Plaintiffs' Brief, p. 37 n.21; Plaintiffs' Reply Brief, p. 13; Tr. 39.

**47.** Defendant Powers, who has not requested the opportunity to make further submissions concerning the I–84/I–86 Connector, is invited to submit such additional papers as he desires on this issue, by December 3, 1980.

tiffs file a reply brief on this issue no later than December 17, 1980.

### Conclusion

For the foregoing reasons, the court:

1. Denies the plaintiffs' motion for partial summary judgment insofar as it pertains to Sections I and II of the proposed I–84 extension;

2. Grants the defendants' motion for summary judgment as to the plaintiffs' claims relating to Sections I and II, without prejudice to the assertion of similar claims if subsequent actions by the defendants render them ripe for judicial review; and

3. Defers decision on the pending motions to the extent that they raise questions concerning the decision to authorize construction of the I–84/I–86 Connector. Until the court rules on those issues, the defendants shall be permitted to engage in further design work for the I–84/I–86 Connector, but shall not act to acquire rights–of–way or commence construction.

It is so ordered.